GLOUCESTER FIRE FIGHTERS, LOCAL 762, INTERNATIONAL
ASSOCIATION OF FIRE FIGHTERS *vs.* CITY OF GLOUCESTER
& another.[1]

Essex.    May 23, 1979. — July 11, 1979.

Present: GOODMAN, ROSE, & GREANEY, JJ.

*Municipal Corporations*, Contracts, Municipal finance, Collective bar-
gaining. *Contract*, Collective bargaining contract, With municipal-
ity. *Parliamentary Procedure.*

A city council's vote to approve supplemental appropriations for a
firefighters' contract constituted a vote to fund the agreement by
assigning a particular amount to each item requested; the council's
comments subsequent to the vote to leave "approval" of the collec-
tive bargaining contract to a later meeting were not a motion for
reconsideration of the funding vote in compliance with the proce-
dure set forth in the city charter nor were they a motion to rescind
the appropriations. [109-112]

CIVIL ACTION commenced in the Superior Court on Sep-
tember 1, 1977.

The case was heard by *DeGuglielmo*, J., a judge of the
Municipal Court of the City of Boston sitting under statu-

*Joseph G. Sandulli (Jane Kahn Alper* with him) for the
plaintiff.

*Norman C. Ross*, City Solicitor, for the defendants.

GREANEY, J. This appeal arises from a dispute concern-
ing the action of the Gloucester city council (council) with
regard to the funding of a collective bargaining agree-
ment reached between the plaintiff, Gloucester Fire
Fighters, Local 762 (union), and the mayor.

---

[1] The mayor of Gloucester.

The undisputed facts that gave rise to the complaint are these. On August 16, 1977, after a period of bargaining, the mayor and the union signed a collective bargaining agreement for the Gloucester firefighters. The agreement was retroactive to July 1, 1977, with a termination date of June 30, 1979. Among the provisions concerning wages, hours and conditions of employment, the city agreed to an "Educational Incentive" clause as set forth in the margin.[2] On the same day that the agreement was executed, the mayor, in keeping with the obligations imposed on him by G. L. c. 150E, § 7(b), submitted a supplemental budget request to the council to fund the 1977 cost items of the contract. That request contained seven items, totalled $119,128, and in a line item made a specific request for an appropriation of $12,000 to fund the educational incentive clause.[3] All the requests were referred to the council's committee on budget and finance, a subcommittee of which, on August 18, 1977, agreed to recommend to the full council at its meeting scheduled for August 23, 1977, that all the funds earmarked for the firefighters' contract be approved. The vote of the subcommittee contained the notation that "final approval of the contracts themselves could be at any time and that approval of the supplemental requests would not give any expressed approval of the contracts." On August 23, 1977, the council held its special meeting, and voted unanimously to approve the total requested supplemental appropriations for the firefighters' contract as recom-

---

[2]                          "ARTICLE XXII
EDUCATIONAL INCENTIVE:
    There shall be an educational incentive in the following amounts: 30 credit hours—$750. The incentive shall not be included in the base pay and it shall be paid annually on the first pay day in December. The hours must be in a program leading to an A.A. in Fire Science, at an accredited school."

[3] It also requested that the council do all that was necessary to enable it to act on the appropriations at their meeting scheduled for August 29.

mended by its subcommittee. By virtue of the line item requests as to each appropriation, the funds for the educational incentive clause were specifically approved. The minutes of the meeting, however, also contained a recital that the budget and finance subcommittee "reported that they would make a final recommendation on the firefighters' contract at the Council's August 29, 1977, meeting. The Council agreed with the Committee's contention that approval of the supplemental appropriations would not express any approval of the collective bargaining contracts . . . ."[4] No member of the city council moved for reconsideration of the vote, as authorized by § 2-11(e) of the Gloucester city charter.[5]

At the council's meeting on August 29, 1977, extensive discussion took place regarding the firefighters' contract, focusing on the provision for educational incentives. The budget and finance committee had stated that it felt that the amount specified for educational incentive payments was too high, but because "the Committee and the Council were unaware of the issues involved and the concessions made in the collective bargaining process, that the contract should be approved, with the incentive payment clause intact." However, the council voted to "separate" the educational incentive clause from the contract. The union's legal counsel expressed the opinion that the previous vote had funded the contract and that by delving into the merits of the contract the council was exceeding

---

[4] At the same meeting the council voted to appropriate $156,245 to fund the contract of the municipal employees.

[5] Section 2-11(e) of the charter provides as follows:

"(e) Council Reconsideration—The clerk of the city council shall hold every measure adopted by the city council for a period of twenty-four hours, Sundays and legal holidays excepted, and if during said time notice of an intent to file a motion to reconsider the matter is filed with the clerk of the council by any member entitled to make such a motion, the measure shall be returned to the city council for further action. If no such statement of intent is filed with the clerk of the council he shall, at the expiration of the said twenty-four hour period forthwith present the matter to the mayor."

its authority. Discussion ensued and proceeded into the merits of the incentive payment as it related to the firefighters' job performance and salaries. In the course of the debate, one councillor observed that "if the union stands by its contention that the contract has been approved because the Council has approved supplemental budgets, then the Council *can rescind its action* on the supplemental budgets" (emphasis supplied). At the conclusion of the discussion, the council voted not to "approve" the educational incentive clause.[6]

Following this vote, the union and the city continued their quarrel over the funding of the contract, but moved the venue of the dispute from the council chamber to the courtroom.[7] The union claimed that the August 23 vote had funded the entire contract; the city asserted that what it did at the August 29 meeting was the last word on the subject and that it had thus funded everything in the contract but the educational incentive clause. A judge considered the facts recited previously under the union's motion for summary judgment (Mass.R.Civ.P. 56 [a], 365 Mass. 824 [1974]) and ruled that "no appropriation was ever adopted by the [council] to support the action seeking to implement the Educational Incentive in the Collective Bargaining Agreement." Pursuant to this ruling, a judgment was entered dismissing the union's action. We hold this ruling to be in error and reverse.

General Laws c. 150E governs public sector collective bargaining and divides the responsibilities with reference to a municipal labor contract between the city's chief

---

[6] The exact votes were as follows:

"The motion to approve the contract minus Article 22 was adopted on roll call vote #2, Councillors Lyon and Whynott voting 'no'.

"Councillor Khambaty then moved that the Council approve Article 22 of the Firefighters' contract. Seconded by Councillor Whynott....

"The motion was defeated on roll call vote #3, Councillors Khambaty, Lyon and Whynott voting 'yes', thereby rejecting Article 22."

[7] The union filed a complaint for declaratory relief pursuant to G. L. c. 231A.

executive officer (the mayor) and its legislative branch (the council). Once the mayor had arrived at an agreement with the firefighters' union, § 7(*b*) of the chapter, as appearing in St. 1977, c. 278, § 4, required him within thirty days of the agreement's execution to request of the council an appropriation to fund the cost items in the agreement. It required the council, as the appropriating body, in the event of a rejection of any requested appropriations, to return the cost items rejected "to the parties for further bargaining." The manner in which the council performed that function raises two questions which lead to the denouement of this controversy: (1) whether the council's actions on August 23 appropriated the funds necessary to fund the agreement, and, if that question is answered affirmatively, (2) whether the council's subsequent actions on August 29 amounted to a reconsideration or rescission of the appropriations.

In our opinion what transpired on August 23 constituted a vote to fund the contract and in particular its educational incentive clause. The budget and finance subcommittee expressly voted to recommend funding of all the cost items. The notation in its report to the effect that it expressed no "approval" of the contract was a characterization compatible with a disclaimer of the merits of the agreement, an indication that the negotiating responsibility rested with the mayor. The council's actions on August 23 are to be viewed in light of the meaning of the word "appropriation." "The appropriation of money by a vote is a common proceeding in the governing bodies of ... municipalities .... To 'appropriate' money, or anything else, is to set it apart or assign it to a particular use or purpose." *Kelley* v. *Sullivan*, 201 Mass. 34, 35-36 (1909). See also *Opinion of the Justices*, 373 Mass. 911, 914 (1977). The council's vote to adopt the recommendations of the subcommittee and approve the supplemental appropriations for the firefighters' contract constituted a vote to fund the agreement by assigning a particular amount to each item requested, including the educational incentive.

The council's comments subsequent to the vote to leave "approval" of the collective bargaining contracts (including the firefighters') to the August 29 meeting were not a motion for reconsideration of the funding vote in compliance with the procedure governing reconsideration set forth in § 2-11(e) of the city charter (see note 5, *supra*), nor were they a motion to rescind the appropriations. The events at the August 29 meeting did not act to unravel the prior funding vote and could have not effect on the contract. Once the appropriation became final by reason of lack of reconsideration the contract between the parties took effect and could not be belatedly rescinded.

The authority relied upon by the city does not persuade us to the contrary. The city relies principally on *Murphy, AIA, & Associates* v. *Brockton*, 364 Mass. 377 (1973). That case stands for the proposition that a person who contracts to render services to a municipality can recover only the amount specifically appropriated for those services, absent certain exceptions not applicable here. The decision is not helpful in our inquiry because it involves a set of circumstances materially different from those before us, with the most apparent distinction from the *Murphy* case being the lack in that case of a specific appropriation for the contract item in question. Other cases brought to our attention by the city, *Wormstead* v. *Lynn*, 184 Mass. 425, 428 (1903), *Decatur* v. *Auditor of Peabody*, 251 Mass. 82, 90 (1925), and *Marlborough* v. *Cybulski, Ohnemus & Associates*, 370 Mass. 157, 159-160 (1976), state certain general propositions in the area of municipal finance that are also not applicable to the circumstances before us. Each of them reiterates the principle that a municipal department cannot incur a liability in excess of the appropriations made for that department; this case does not concern itself with liabilities in excess of appropriations, but rather with whether, once the period for reconsideration had expired, it was capable of rescission. This is also not a case of the type discussed in *E.F. Semas Trucking, Inc.* v. *Mayor of Taunton*, 7 Mass.

App. Ct. 907 (1979), which held that a city council could waive its own rules as to a still pending matter. Unlike that case, the charter provision here imposed a restriction which had the force of a statute (see G. L. c. 43, § 2). and the August 23 council vote sealed the contract in all respects. See *Kitty* v. *Springfield*, 343 Mass. 321 (1961).

Finally, we do not think that we have examined the record of the council's actions in a captious fashion. As the appropriating body, the council in effect had a veto power over the contract which it could have exercised by declining to fund all or any part of it. It was certainly entitled to take a reasonable amount of time to study the merits of the submitted appropriations and to consider their impact on the finances of the city. It also had a limited right to change its mind. 4 McQuillin, Municipal Corporations § 13.48 (3d ed. 1968). Here, however, restraints on that right to a change of mind were imposed in part by G. L. c. 150E, which seeks to promote the commendable goal of providing finality to collective bargaining agreements, and by the procedure governing council reconsideration contained in the charter. We conclude that the council's misapprehension as to its powers cannot be used to nullify an appropriation proper in all other respects. As was aptly observed by Mr. Justice Cutter in the *Kitty* opinion, 343 Mass. at 326: "As responsible members of a municipal legislative body their votes must stand as cast, unless duly and seasonably changed in accordance with applicable parliamentary principles."

The judgment is reversed and a new judgment is to be entered declaring that the collective bargaining contract in question was funded in accordance with the provisions of G. L. c. 150E, on August 23, 1977, as to all its items including the educational incentive clause.

*So ordered.*