MILDRED YERETSKY & another[1] vs. CITY OF ATTLEBORO.

Bristol. January 6, 1997. - February 28, 1997.

Present: WILKINS, C.J., O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Municipal Corporations,* Group insurance, Home rule. *Statute,* Construction. *Insurance,* Group.

Explication of the provisions of G. L. c. 32B, § 16 [316-319], and discussion of its legislative history [319-321].

This court construed the provisions of G. L. c. 32B, § 16, to require a municipality accepting that provision to pay at least 50% and up to 90% of health maintenance organization (HMO) premium costs for retirees and nonunionized employees, as that interpretation best corresponds to the Legislature's intent that the contribution rates for HMOs, as is the case with indemnity plans, be determined through the local political process. [321-324]

CIVIL ACTION commenced in the Superior Court Department on August 14, 1991.

The case was heard by *John A. Tierney,* J., on a motion for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Philip Collins (John P. Lee* with him) for the defendant.

*William G. Rehrey* for the plaintiffs.

*David P. Rome* for Professional Firefighters of Massachusetts, amicus curiae, submitted a brief.

*Philip Collins* for Massachusetts Municipal Association, amicus curiae, submitted a brief.

GREANEY, J. The plaintiffs are two retired employees of the defendant, the city of Attleboro (city). They are members of the city's retirement system and not members of any collective bargaining unit. The plaintiffs brought a complaint in the Superior Court seeking declaratory and injunctive relief in connection with a claim that, under the third paragraph of

[1]Mathew Savastano.

G. L. c. 32B, § 16, which concerns the allocation of premium costs for health maintenance organization (HMO) coverage (see note 6, *infra*), the city was obligated to pay 90% of their HMO premium costs from July 1, 1990, and continuing. It was agreed that, since at least August, 1985, the city has offered its retired employees health insurance coverage under a Blue Cross/Blue Shield group indemnity plan and has paid 50% of the premium costs. During the same period, the city has offered several HMO plans to retired employees and has contributed toward the premium cost of these plans at rates varying between 50% and 81.3%.[2] Based on these facts and a stipulation as to damages, the plaintiffs moved for summary judgment, and their motion was allowed. Judgment entered declaring that, from July 1, 1990, and continuing, the city was obligated to pay 90% of the plaintiffs' premium costs for HMO coverage. The judgment also directed the city to repay to the plaintiffs, any overpayments of premiums made by them for HMO coverage, with interest.[3] The city appealed, and we transferred the appeal from the Appeals Court to this court on our motion. We vacate the paragraphs of the judgment that made the declarations and orders just stated and direct the entry of new declarations.

The plaintiffs' claims involve G. L. c. 32B, a local-option statute that governs the provision of health insurance to active and retired employees of municipalities and other State political subdivisions.[4] Under the home rule amendment (art. 89 of the Amendments to the Massachusetts Constitution), a local-option statute becomes effective in a city and town only

---

[2]Since July 1, 1995, the city has paid 75% of the premium costs for both indemnity plans and HMOs for retirees.

[3]The judgment also declared and ordered that, from July 1, 1989, to September 30, 1989, the city was obligated to pay the same dollar contribution toward premiums for HMO coverage as it paid toward premiums for Blue Cross/Blue Shield indemnity coverage. (Payments for the period from October 1, 1989, to June 30, 1990, were not at issue.) The city does not challenge this part of the judgment on appeal.

[4]The statute also covers the dependents of these employees. For the purpose of simplicity, we use the term "municipal" throughout this decision in reference to the coverage of G. L. c. 32B, but our statements and conclusions apply to all political units covered by this chapter.

when the municipality votes to adopt its provisions.[5] See D. Randall & D. Franklin, Municipal Law and Practice §§ 1, 8 (1993). Before a municipality offers a group health insurance plan to its employees, it evaluates the options offered in the various provisions of the statute. The municipality then adopts only those provisions of the statute that best accommodate its needs and budget. See *id.* at § 295; G. L. c. 32B, § 3. The statutory language governing the local options available for traditional indemnity group health insurance programs differs from that governing HMO programs. See G. L. c. 32B, §§ 7, 7A, 9, 9A, 9E, and 16. As the landscape of group health insurance has changed, the language of the statutory provisions governing these two types of health insurance plans has sometimes created unanticipated fiscal challenges for municipalities, one of which is before us in this case.

Traditional group health insurance plans are governed by G. L. c. 32B, §§ 7, 7A, 9, and 9E. For active employees, c. 32B, § 7, establishes a public contribution of 50% toward the cost of such plans. If the municipality instead opts for § 7A, it may then choose to contribute more than 50%. For retirees, the chapter's "default" provision is § 9, according to which retirees are required to pay the entire cost of such health insurance. As an alternative, a municipality may opt to pay 50% of the retirees' indemnity plan costs by adopting § 9A, or a higher percentage by adopting § 9E.

Municipalities may make HMO plans available to active and retired employees by accepting § 16 of c. 32B, which was inserted by St. 1971, c. 946, § 5.[6] An HMO option was also provided to State employees by the same act. See G. L. c. 32A, § 14, inserted by St. 1971, c. 946, § 2. The third paragraph of § 16, as amended through St. 1989, c. 653, § 37 (effective July 1, 1990; *id.* at § 242), now reads as follows:

> "All persons eligible for the insurance provided under section five shall have the option to be insured for the services of a health care organization under this section

---

[5]For a city, the vote is by the city council; in a town, by vote of the inhabitants at a town meeting; and in a municipality with a town council form of government, by the town council. G. L. c. 32B, § 10.

[6]The statute uses the term "health care organization," as defined in G. L. c. 32B, § 2 (*j*). We use the now more common term "health maintenance organization" (HMO) throughout this opinion.

but shall not be insured for both. Eligible persons, having elected coverage under this section by making application as provided in section six, shall pay a minimum of ten percent of the total monthly premium cost or rate for coverage under this section, and the governmental unit shall pay the remainder of the total monthly premium cost or rate; provided, however, that nothing in this chapter shall preclude the parties to a collective bargaining agreement under chapter one hundred and fifty E from agreeing that such eligible persons shall pay a percent share of such total monthly premium cost or rate which is higher than said ten percent; provided, further, that such eligible persons shall in no event be required to pay more than fifty percent of such total monthly premium cost or rate. Such payment by the insured shall be made to the governmental unit as provided in sections seven, seven A, nine A, nine B, nine C, nine D and nine E, as may be applicable."

At issue is the meaning of the second sentence in this paragraph. The sentence states that "[e]ligible persons . . . shall pay a minimum of ten percent" of the HMO premium with the remainder to be paid by the governmental unit, and then goes on to add two provisos: first, that parties to a collective bargaining agreement may agree that "such eligible persons" shall pay more than 10% of the premium, and second, that "such eligible persons" shall in no case pay more than 50%. The parties in this case offer contrasting interpretations of this second sentence.

(a) The plaintiffs contend that the two provisos operate together to modify the general statement in the first part of the sentence. Under this reading, unionized employees may, through collective bargaining, agree to pay more than 10%, but no more than 50%, of the premium. Other eligible persons (including retirees and nonunionized employees) are to pay exactly 10%.[7]

(b) The city argues that the second proviso is independent of the first. Under the city's construction, all eligible persons are to pay no less than 10% and no more than 50%. Unionized employees may only be charged more than the minimum

---

[7]The plaintiffs face the problem of explaining why "a minimum" of 10% means "no more than" 10% for retirees and nonunionized employees. See note 14, *infra*.

if so provided in the governing bargaining agreement. For other eligible persons, the payment rate (within the 10% to 50% range) is to be determined through the local political process, as is the case with contributions to indemnity plans.[8]

As a general rule, "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975), and cases cited. Here, the meaning of the provision is ambiguous. It is appropriate to consider the history of G. L. c. 32B, § 16, and the reasons why the third paragraph on HMO contributions was amended through St. 1989, c. 653, § 37, to its current wording. Furthermore, we keep in mind that two or more statutes that relate to the same subject matter should be construed together "so as to constitute a harmonious whole consistent with the legislative purpose." *Board of Educ., supra* at 513-514. Hence, we may consider the relationship of § 16, governing municipal premium contributions for HMOs, to other statutory provisions governing both municipal premium contributions for indemnity plans and the State's premium contributions for HMOs. Based on these considerations, we conclude that the city's interpretation of the disputed paragraph is the one that best corresponds to the Legislature's intent.

According to the wording of c. 32B, § 16, in effect before the disputed language was inserted, the municipal contribution toward an HMO premium for an employee was to be the "same amount" as would have been contributed to an

[8]There is a third possible interpretation: that unionized employees are to pay from 10% to 50%, based on collective bargaining agreements, while other eligible persons must pay from 10% to 100%, as determined by the municipality. Although this alternative is the most favorable to the city, it is not the one that they have advocated. As we shall subsequently discuss, the interpretation actually advocated by the city more closely addresses the purposes of the statute than either the plaintiffs' interpretation or this third alternative.

indemnity plan for that person.[9] In 1984, the Appeals Court ruled that the "same amount" meant the same *dollar* amount, not the same percentage of the total premium due. *Hemman* v. *Harvard Community Health Plan, Inc.*, 18 Mass. App. Ct. 70, 72-73 (1984). The court noted that the title to St. 1971, c. 946, indicated that the option to elect HMO coverage was to involve "no additional premium charge" to a governmental unit over the cost of indemnity insurance, and that this would only be achieved, whatever the relative prices of the two plans, with a "same dollar amount" interpretation. *Id.* at 73-74.

During the 1980's, the cost of indemnity plan coverage began to exceed the cost of HMO coverage. See *Ludlow Educ. Ass'n* v. *Ludlow*, 31 Mass. App. Ct. 110, 113 (1991). By a process of adverse selection, younger and healthier employees tended to shift into HMOs, and indemnity plan premiums rose for those remaining in the traditional plans, resulting in increased governmental costs. *Id. Hemman, supra* at 70, 74 n.7. This shift to HMOs was exacerbated by the "same dollar" rule, which made it possible for some employees to belong to an HMO for free.[10] See *Everett* v. *Local 1656, Int'l Ass'n of Firefighters*, 411 Mass. 361, 362-363 (1991); *School Comm. of Brockton* v. *Brockton Educ. Ass'n*, 36 Mass. App. Ct. 171, 172 (1994). Besides facing higher health benefit costs, municipalities risked losing access to indemnity plan coverage altogether if the groups covered by such plans shrank to a point where insurers would refuse coverage. See, e.g., *Kusy* v. *Millbury*, 417 Mass. 765, 766 (1994).

The Legislature responded to these problems by including provisions in St. 1989, c. 653, that amended the payment

---

[9]As originally worded, § 16 provided that the municipality's HMO contribution was to be "the same as and shall not exceed" the contribution to an indemnity plan. By St. 1976, c. 454, § 2, the word "amount" was inserted after "same." This amendment only emphasized, and did not alter, the original legislative intent. *Hemman* v. *Harvard Community Health Plan, Inc.*, 18 Mass. App. Ct. 70, 73 (1984). The provision on State contributions to HMOs, G. L. c. 32A, § 14, inserted by St. 1971, c. 946, § 2, read "same as and shall not exceed," until it was amended through St. 1989, c. 653, § 36.

[10]For example, if the total cost of an indemnity plan was $500, and that of an HMO was $400, and the municipality had committed itself to paying 80% of the cost of the indemnity plan, it was required to pay $400 toward either the indemnity plan or the HMO, making the HMO free to the employee.

formulas for both State and municipal HMOs to eliminate the "same dollar amount" rule. Chapter 653, which was titled "An Act establishing the budget control and reform act of 1989," was passed at a time of critical fiscal problems at both the State and local levels of government.[11] The statute reduced appropriations in the State budget and contained over 200 other provisions. In contrast to the 1971 legislation that had created the State and municipal HMO options, c. 653 established different payment formulas for each. The State contribution to its HMOs was changed to "the same percent share" as for indemnity plans. G. L. c. 32A, § 14, as amended through St. 1989, c. 653, § 36. The Legislature considered, but rejected, proposals to apply this "same percent" formula to municipal HMOs as well. Instead, the Legislature enacted, as § 37 of c. 653, the new language for G. L. c. 32B, § 16, that is the subject of this dispute.[12] Although the enacted provisions were different, the Legislature's purposes in amending both c. 32B, § 16, and c. 32A, § 14, were the same: to enable government employers to gain control over health care costs and to reduce the financial incentives that had favored HMO enrollment and had led to adverse selection.[13]

The plaintiffs argue that their interpretation of the disputed language in the third paragraph of § 16 accords with the

[11]See, e.g., Report of the Senate Committee on Post Audit and Oversight, Analysis of the State's Fiscal Crisis, 1989 Senate Doc. No. 2125; Report of the Senate Committee on Post Audit and Oversight, "Local Government Finance in 1990: An Unfolding Crisis," 1989 Senate Doc. No. 2130. These reports were issued in November and December, 1989, respectively, while the Legislature was considering the proposals that were incorporated into St. 1989, c. 653, which was ultimately approved on January 4, 1990.

[12]The Senate adopted the percentage formula for municipal HMOs in its version of the budget-control measure, 1989 Senate Doc. No. 2136, § 205, but the Senate proposal was replaced with the current wording in a conference committee report, 1989 House Doc. No. 6565, § 37. The conference report was then approved by both branches and enacted into law as St. 1989, c. 653.

[13]One reason for the Legislature to adopt different provisions for State and municipal HMO contributions was the variation in health insurance benefit terms at the local level, resulting from the collective bargaining process. This variation made it necessary to establish protections for existing municipal collective bargaining agreements that called for "equal dollar" contributions. See *Everett* v. *Local 1656, Int'l Ass'n of Firefighters*, 411 Mass. 361, 366 (1991). See also *National Ass'n of Gov't Employees* v. *Commonwealth*, 419 Mass. 448, 454-455 n.12, cert. denied, 515 U.S. 1161 (1995) (G. L. c. 32A, § 8, which provides for State's contribution to em-

legislative purpose by requiring those persons who previously had paid nothing towards their HMO membership to begin paying 10% of the cost.[14] However, in many communities, including the city, setting the retiree (and nonunionized employee) HMO contribution rate at 10% would reduce the current levels of participant contributions, causing increases in municipal costs and providing further incentives to enroll in HMOs. The city's interpretation of this section of the statute provides much greater likelihood of reduced costs and increased controls by giving municipalities the flexibility to set rates in order to eliminate the impact of cost differentials on plan selection. In the case of unionized employees, rates will be set as part of a collective bargaining process.[15]

Although the amendment to § 16 disconnects the prior link between municipal contributions to indemnity plans and HMOs, our interpretation maintains a degree of congruence between the two types of coverage that is absent from the plaintiffs' interpretation.[16] The gap between payments for

---

ployee health insurance premiums, does not distinguish between employees who do and do not have collective bargaining agreements).

[14]The impact of the amendment to G. L. c. 32B, § 16, was lessened by § 218 of St. 1989, c. 653, which "froze" contribution rates for unionized employees at current levels so long as existing collective bargaining agreements remained in effect unless the parties agreed otherwise.

The plaintiffs rely on § 218 to explain why the phrase "a minimum of ten percent" appears in G. L. c. 32B, § 16. They argue that this phrase was needed to account for unionized employees who were paying more than 10% at the time of enactment and who were, under the provisions of St. 1989, c. 653, § 218, to continue doing so during the life of their contract, without having bargained to that effect under the first proviso of § 16. Our explanation of "minimum" is more straightforward: it establishes a floor, not a ceiling.

[15]The plaintiffs contend that, because the term "such eligible persons" is used in both provisos, it must refer in each case only to unionized employees. We instead read the two provisos independently, with "such eligible persons" referring back, in each case, to the group of persons eligible for health benefits. Compare the use of the phrase "such eligible persons" in G. L. c. 32A, § 14 (as amended through St. 1989, c. 653, § 36), rewritten in the same act as c. 32B, § 16. Either explanation is grammatically plausible, but the one we favor is more logical in the context of the legislative purpose.

[16]It is now impossible to achieve complete consistency between the contribution schemes for persons covered by indemnity plans and those who belong to HMOs, because the new wording of § 16, however it is interpreted, breaks down the set of eligible persons into different categories

indemnity plans and HMOs is likely to be much smaller under our interpretation, particularly for retirees and nonunionized employees, than under the plaintiffs' interpretation. Under our construction of the language, municipalities will pay at least 50% and up to 90% of HMO premium costs. By comparison, for indemnity plans, municipalities pay 50% for active employees if G. L. c. 32B, § 7, is the governing provision, and a greater amount if § 7A has been adopted. For retirees, the municipality is not required to pay anything toward the premium cost of indemnity plans but most have adopted G. L. c. 32B, § 9A or § 9E, and pay 50% or more.[17] Under the interpretation argued for by the plaintiffs, municipal contributions to HMO costs would range from 50% to 90% for unionized employees (depending on the outcome of negotiations), and would be fixed at 90% for retirees and nonunionized employees. This simply is not a logical result.

The judge offered an additional rationale for the plaintiffs' interpretation based on his view of legislative intent. In the judge's opinion, § 16 "exhibits a special legislative concern" for governmental employees and retirees, and "prohibits a unilateral increase by employers in the percentage contribution" required from those persons, by allowing changes to the 10% contribution rate only through union approval or (in the case of retirees and nonunionized employees) through an act of the Legislature. It has been suggested that this restriction was intended to protect retirees and nonunionized employees, who lack the bargaining power of workers represented by a union. We find this argument unconvincing, considering that no such restriction applies, and no such protection is offered, to retirees enrolled in indemnity plans. For indemnity plan retirees, the municipal contribution rate, whatever its amount, is determined in all instances by decisions made at the local

than exist in the case of indemnity plans. The rules governing indemnity plans categorize eligible persons as either retirees (who are covered by §§ 9, 9A, or 9E) or active employees (covered by §§ 7 or 7A). Active employees include both unionized and nonunionized personnel. The rules in § 16 for HMO contributions, however, group the eligible persons differently, by establishing a rule that applies only to unionized employees.

[17]The amicus brief filed by the Massachusetts Municipal Association on behalf of the city reprints survey results from the May, 1993, newsletter of the Retired State, County and Municipal Employees Association, indicating that all cities and all but fifty-seven towns pay at least 50% of retirees' health insurance premiums.

governmental level. It is more plausible to us that the Legislature intended to allow the contribution rates for HMOs to be determined through the local political process, as is the case with indemnity plans. Our interpretation allows that to occur.

The second and third paragraphs of the judgment are vacated. These paragraphs are to be replaced by a new paragraph declaring that, because the city has paid at least 50% of the cost of the plaintiffs' HMO premium costs from July 1, 1990, and continuing, the city has satisfied the requirements of G. L. c. 32B, § 16, and therefore, the plaintiffs are not entitled to recover anything from the city for alleged overpayments of premium costs since July 1, 1990. The fourth paragraph is vacated, and is to be replaced by a new paragraph declaring that the plaintiff Mathew Savastano is to recover of the city the sum of $175.98, together with interest at the rate of 12% as provided by law, for overpayments made by him for his HMO coverage during the period from July 1, 1989, to September 30, 1989.

*So ordered.*