# Boston Teachers Union, Local 66 AFT, AFL-CIO *vs.* City of Boston & another.[1]

No. 96-P-1482.

Suffolk. December 16, 1997. - May 14, 1998.

Present: Laurence, Kaplan, & Lenk, JJ.

*Municipal Corporations,* Insurance. *School and School Committee,* Collective bargaining, Group insurance. *Labor,* Health benefit plan. *Contract,* Collective bargaining contract. *Health Maintenance Organization. Insurance,* Group.

The different rate of contribution to health insurance premiums by municipal employees required by G. L. c. 32B, § 16, as amended through St. 1989, c. 653, § 37, effective July 1, 1990, was not applicable to insurance contribution provisions determined by a collective bargaining agreement effective from 1989 through 1992, where the contribution rates in the collective bargaining agreement were "grandfathered" by St. 1989, c. 653, § 218, for the period during which the agreement was effective. [754-757]

Civil action commenced in the Superior Court Department on September 25, 1990.

The case was heard by *Regina L. Quinlan,* J., on motions for summary judgment.

*John Foskett* for the defendants.

*Christine L. Nickerson* for the plaintiff.

Kaplan, J. Did the city of Boston, during the period July 1, 1990, to August 31, 1992, properly withhold ten percent of health insurance premium costs from the salaries of its unionized school department employees who had elected health maintenance organization (HMO) coverage? That is the narrow issue of this case. The city would have us answer in the affirmative, pointing to the statement of G. L. c. 32B, § 16 (as amended through St. 1989, c. 653, § 37), that, commencing on July 1, 1990, municipal employees shall contribute a minimum

---

[1] School committee of the city of Boston.

44 Mass. App. Ct. 746 (1998)     747

Boston Teachers Union, Local 66 AFT, AFL-CIO *v*. City of Boston.

of ten percent toward their HMO premiums. On the other hand, the unionized employees urge us to look at their collective bargaining agreement dated September 1, 1989, through August 31, 1992, and to St. 1989, c. 653, § 218,[2] which "grandfathered" HMO contribution rates "determined by a collective bargaining agreement" before January 4, 1990, until the expiration of the agreement.

On September 25, 1990, after the city commenced the withholdings, Boston Teachers Union (BTU) filed a complaint in Superior Court on the grounds just mentioned, seeking a declaration and injunction against the city and the school committee, named as defendants. The defendants answered that the collective bargaining contract, though dated and funded from September 1, 1989, had not been fully funded by the Boston city council as of January 4, 1990, and therefore the HMO contribution rates were not then "determined by a collective bargaining agreement." The parties submitted a set of stipulated facts and copies of the 1989-1992 collective bargaining agreement and a previous one dated 1986-1989 and filed cross motions for summary judgment. The Superior Court judge ruled that the employees' HMO contribution rates had been "determined" before January 4, 1990, and thus § 218 prohibited the city from withholding the ten percent of HMO premium costs until the expiration of the collective agreement on August 31, 1992. We read § 218 to the same effect and affirm the judgment in the plaintiff's favor.

1. *Narrative.* a. *Bargaining.* The city of Boston, as a municipal employer, has elected to provide health insurance coverage to its employees, see G. L. c. 32B, § 3, including the several thousand teachers, paraprofessionals, and other professional educators employed by the Boston school department.

---

[2]Section 218 reads in relevant part as follows: "[T]he percent contribution to the total monthly premium cost or rate for coverage under [c. 32B, § 16] for any employees of any governmental unit where such percent contribution is determined by a collective bargaining agreement as of the effective date of this act shall not be altered until the expiration date of said collective bargaining agreement, unless the parties to said agreement agree otherwise, and in no event shall the provisions of said section sixteen be construed to require any governmental unit to reduce the percent share contributed to such coverage by its employees below the percent share contributed as of the effective date of this section until such time as a different percent contribution is in fact determined by a collective bargaining agreement and such collective bargaining agreement becomes effective."

Coverage is provided to these school employees through indemnity plans, see G. L. c. 32B, § 7A, and through HMO plans, see § 16. The city's contributions to these plans are fixed by statute with certain leeways for collective negotiation.[3] Boston Teachers Union (BTU), as certified bargaining representative of those school employees, following negotiations, entered into a collective bargaining agreement with the school committee for the period September 1, 1986, to August 31, 1989 (the three-year maximum period allowed by G. L. c. 150E, § 7[*a*]). This agreement required Boston to contribute 75% of the premium costs under an identified indemnity plan, the Blue Cross and Blue Shield Master Medical Plan, or, where an employee chose an HMO plan (listed in the agreement as "Harvard or other plan"), with benefits different from the indemnity type, then "the employer contribution . . . shall be equal in dollar amount to the dollar costs of the employer's aforesaid percentage contribution" under the indemnity plan.[4] Because the indemnity plan's premium costs as negotiated in the agreement were in fact significantly higher than those of the selected HMOs, employees electing HMO coverage made no contribution to the premium costs.[5]

In June, 1989, BTU and the school committee began negotiating a successor agreement to the one expiring by its terms on

[3]The city's election of § 7A requires it to pay at least 50% of the premium costs of indemnity plans chosen by employees. By electing § 16 (as in effect prior to its 1989 amendment), the city was required to pay the "same amount" for HMO premiums as it did for indemnity premiums. Section 16, as amended through St. 1989, c. 653, § 37, now requires the city to pay between 50 - 90% of HMO premium costs.

[4]This wording accorded with G. L. c. 32B, § 16, as it existed before the 1989 amendment: "The governmental unit's contribution toward the total monthly premium cost or rate for coverage under this section shall be the same amount as and shall not exceed the governmental unit's contribution for the health insurance programs provided under sections three, five and eleven C . . . ." In *Hemman* v. *Harvard Community Health Plan*, 18 Mass. App. Ct. 70, 72-73 (1984), this court ruled that the "same amount" meant the same dollar amount, not the same percentage of the total premium due. See *Yeretsky* v. *Attleboro*, 424 Mass. 315, 320 (1997).

[5]By way of example: "[S]uppose a monthly Blue Cross/Blue Shield premium of $[600], to which the public employer was required [by the collective bargaining agreement] to pay [seventy-five] percent and the employee [twenty-five] percent. In that case the employer's share would be $450. If the monthly premium for an HMO were $440, the employer would pay the entire premium." *School Comm. of Brockton* v. *Brockton Educ. Assn.*, 36 Mass. App. Ct. 171, 172 n.1 (1994).

August 31, 1989. The parties executed a "tentative agreement" which stated that the 1986-1989 agreement "is amended as set forth below." And "[t]he amended contract shall be effective from September 1, 1989, through August 31, 1992," provided it was ratified by the parties and the Boston city council voted a supplemental appropriation to the budget of the Boston school department sufficient to fund the contract for the first year.[6] "[S]et forth below" was an agreement by which teachers were to receive a 7% salary increase for each of the three years of the contract (together with 5% yearly increases for paraprofessionals, and certain other increases for bonuses and contributions to BTU's "health and welfare fund"). There was no amendment of the health insurance provisions of the 1986-1989 text including those describing contributions under the indemnity and HMO plans.

The tentative agreement was ratified on June 15, 1989, by BTU and on July 15, 1989, by the school committee, and was submitted to the Boston city council, see G. L. c. 150E, § 7(*b*). In November, 1989, the city council refused the necessary appropriation, evidently because it considered the salary increases too steep. When the city council rejects "the request for an appropriation necessary to fund the cost items, such cost items shall be returned to the parties for further bargaining." G. L. c. 150E, § 7(*b*), as appearing in St. 1977, c. 937, § 3. The bargaining occurred in January, 1990, at meetings attended by Edward Doherty, president of BTU; James Burke, president of the school committee (he took office on January 1, 1990); Laval Wilson, Boston school superintendent; and Raymond Flynn, the mayor of Boston. On January 22, 1990, BTU and the committee executed a second "tentative agreement" stating that the first tentative agreement, "to be effective from September 1, 1989, through August 31, 1992, shall remain in effect except as modified below." The only "modification" was a reduction in the teachers' salary increases from 7% each year to 4.5, 4.25, and 4.5% corresponding to each of the three years of the contract (and including a "reopener provision" for the third

[6]An appropriation by the Boston city council sufficient to fund the first year of the contract would serve as authorization of the entire contract, thus binding the council to appropriate the necessary funds for the contract's full term. See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 386 Mass. 197, 203-210 (1982).

year).[7] The agreement was ratified on January 23, 1990, and February 14, 1990. The negotiators named above had entered into a side agreement that, "[u]pon receipt of a request from the Boston School Committee for a supplemental appropriation sufficient to fund the cost of this agreement, the Mayor . . . shall submit such request to the Boston City Council and support its passage." On February 6, 1990, Mayor Flynn transmitted to the city council "a proposed supplemental appropriation . . . in the amount of . . . $13,600,000 . . . to fund the FY [fiscal year] 1990 cost of the 1990 tentative agreement." On March 14, 1990, the city council voted to appropriate that amount.

The final contract between BTU and the school committee incorporates the agreed upon amendments to the 1986-1989 agreement, does not alter the words of the latter agreement about employer contributions to the indemnity and HMO plans, and states that it is "effective from September 1, 1989, through August 31, 1992."[8] There is no reference to St. 1989, c. 653, § 37, or § 218, requiring employee contributions to HMO premium costs but grandfathering the rates determined by a collective bargaining agreement as of the date of the enactment, January 4, 1990.

b. *New legislation.* While BTU and the school committee were negotiating the salary increases and looking to a supplemental appropriation for that purpose, the Legislature, warned about fiscal difficulties ahead by reports in November and December, 1989, of the Senate Committee on Post Audit and Oversight, 1989 Sen. Docs. Nos. 2125, 2130, was in the process of considering proposals to curtail budget expenditures. A budget control bill, 1989 House Doc. No. 6472, voted by the House on November 18, 1989, did not touch on State or municipal employees' contributions to insurance costs. A Senate bill, 1989 Sen. Doc. No. 2136, passed on December 13, 1989, required (in § 205) the State and those municipalities electing to provide HMO coverage to their employees under G. L. c. 32B, § 16, to contribute the "same percentage" of the costs of HMO premiums as they did correspondingly under indemnity

---

[7]The salary increases for the paraprofessionals were not altered (except for a "reopener provision" for the third year of the contract), nor were the increases for bonuses and contributions to the "health and welfare fund."

[8]The final contract on page two states that it is an "AGREEMENT MADE AND ENTERED INTO on the first day of September, nineteen hundred and eighty nine."

plans.[9] A conference committee report, 1989 House Doc. No. 6565, rewrote the Senate proposal; it changed the "same percentage" provision for municipal employees to what became St. 1989, c. 653, § 37, — establishing a "floor" of 10% and a "ceiling" of 50% of HMO premium costs to be borne by the employees. (The "same percentage" formula, however, continued for State employees, see St. 1989, c. 653, § 36, amending G. L. C. 32A, § 14.) This committee report also set out the "grandfather" provision, which became St. 1989, c. 653, § 218.[10] Both houses approved the committee report in late December, 1989, and the measure, containing over 200 sections, was signed by the Governor on January 4, 1990.

2. *Meaning of § 218.* There appears to be no conventional statutory history that illuminates § 218, which turns up in the midst of a large number of budget control items. The case of *Everett* v. *Local 1656, Intl. Assn. of Firefighters,* 411 Mass. 361, 366 (1991) (*Everett I*), offers the general background:

> "In enacting St. 1989, c. 653, §§ 37 and 218, the Legislature was undoubtedly aware of the following: (a) that there was no prior legislative authorization mandating contribution from employees for the cost of HMO premiums; (b) that existing collective bargaining agreements were likely to contain provisions which required governmental units to contribute on an equal dollars basis . . . to the payment of premium costs for both group indemnity and HMO plans; (c) that some protection for these provisions was necessary to avoid a claim that the new assessment authorized by § 37 unlawfully impaired rights protected by existing collective bargaining agreements . . . ."

*Everett I* does not consider the particular meaning or operation of § 218, except as it says that § 218 is "unambiguous in

---

[9]As applied to the present case, as the city was paying 75% of Blue Cross/Blue Shield Master Medical premiums, the "same percentage" formula would oblige it to pay only 75% of HMO premiums.

[10]The grandfather provision was operative as of January 4, 1990, pursuant to St. 1989, c. 653, § 246: "The remaining sections of this act, except as otherwise provided, shall take effect upon its passage." See *School Comm. of Brockton* v. *Brockton Educ. Assn.,* 36 Mass. App. Ct. 171, 173 n.3 (1994) (noting that the effective date of § 218 was January 4, 1990). Statutes 1989, c. 653, § 37 (requiring that employees contribute a minimum of 10% of HMO premium costs) went into effect on July 1, 1990, see § 242.

providing protection from the effect of § 37 to employees whose health care contributions are determined by an existing collective bargaining agreement." *Id.* at 365. Rather, the case examined the ambiguous language of a collective bargaining agreement between firefighters and the city of Everett under which Everett was providing insurance benefits through "Blue Cross/Blue Shield Municipal Master Medical Plan . . . or its equivalent." *Id.* at 363. The court confronted the question whether "or its equivalent" referred to an HMO plan thus importing the protection of the grandfather clause, § 218. *Id.* at 366. This question the court decided to remit for interpretation to the Labor Relations Commission with its special familiarity with labor contracts. *Id.* at 362, 367-370. The commission then read the agreement as setting HMO premium contribution rates, whence it followed that § 218 protected the employees and forbade the city to withhold from their salaries while the contract was in effect, July 1, 1988, to June 30, 1991. The Supreme Judicial Court upheld this decision in *Everett* v. *Labor Relations Commn.*, 416 Mass. 620 (1993) (*Everett II*).[11]

In *School Comm. of Brockton* v. *Brockton Educ. Assn.*, 36 Mass. App. Ct. 171, 172-173 (1994), despite the existence of a collective bargaining agreement in effect from September 1, 1989, through August 31, 1992, Brockton commenced withholding the 10% contribution of c. 32B, § 16, as amended, from the salaries of employees subscribing to HMO coverage. The bargaining agreement, like that in *Everett*, had muddy language about HMO contribution rates, in fact referring only to "Blue Cross and Blue Shield" in its insurance provisions. The court decided that the contract could be interpreted in light of the conduct of employees who had been selecting HMO coverage (apparently with Brockton making contributions to premium costs) while the agreement was in effect. Contractual interpretation under the collective bargaining agreement constituted a "grievance" with arbitration as the fourth level of the grievance procedure spelled out in the contract. In this posture of the case, the court decided that arbitration was the

---

[11]The police unions in the city of Everett went to arbitration (their second attempt) to test whether a "parity clause" in their contracts entitled them to the same result as was reached by the Labor Relations Commission and the Supreme Judicial Court in *Everett II*. The arbitrator held for the unions and our court, on the city's appeal, declined to vacate the award. *Everett* v. *International Bhd. of Police Officers, Locals 633 & 634, ante* 671 (1998).

right procedure. *Id.* at 175-176. As for § 218, the court noted (at 173): "[I]f employees have the benefit of a collective bargaining agreement that allows them to pay less than ten percent of the cost of HMO coverage, they will enjoy that benefit for the life of the agreement, notwithstanding the ten percent minimum generally applicable as a consequence of the 1989 legislation."

Most recently, in *Yeretsky* v. *Attleboro,* 424 Mass. 315, 315-316 (1997), two retired city employees who selected HMO coverage sought injunctive and declaratory relief in the Superior Court to the effect that, under c. 32B, § 16, they were to pay only 10% of their HMO premium costs. The employees based their argument on the fact that § 16, as amended, required a 10% "minimum" employee contribution to HMO premiums but "parties to a collective bargaining agreement" could agree to a higher employee contribution rate (to the "ceiling" of 50%). Since they were not "parties to a collective bargaining agreement" (and resultingly did not have much negotiating power), they were required to pay only the minimum of 10%. *Id.* at 318. A Superior Court judge agreed with the plaintiffs and the city appealed. *Id.* at 316.

The Supreme Judicial Court examined the relevant language of c. 32B, § 16, as amended, finding it to be somewhat ambiguous. To help resolve it, the court looked to the provenience of the amendment, St. 1989, c. 653, § 37. The long run purposes were to reduce budget expenditures and to lessen employees' financial incentive to elect HMOs which, by adverse selection, had threatened the security of indemnity plans. *Id.* at 319-321. The court reasoned (at 319) that the long run legislative purposes would be served by an interpretation that allowed municipalities to seek "through the local political process" to set the contribution of nonbargaining employees, including the plaintiff retirees, between 10 and 50%. As for § 218, the court observed that it "lessened" the impact of amended § 16 because it " 'froze' contribution rates for unionized employees at current levels so long as existing collective bargaining agreements remained in effect unless the parties agreed otherwise." *Id.* at 322 n.14.

The cases bearing on § 218 have not engaged the narrow issue here, which arises on a singular set of facts and is without long run significance — whether the grandfather provision protected the parties' pretty clear expectation and understanding that HMO contribution rates would not change in the 1989-

1992 contract period, although — as commonly happens in public sector contracting — formalities were postponed and had not been concluded by § 218's effective date, January 4, 1990.

3. *City's contract based argument.* In urging us to reverse the judgment of the Superior Court, the city argues: according to the terms of the initial "tentative agreement," it was to become effective "provided that" it was ratified and the city council voted a supplemental appropriation; so, the argument goes, until March, 1990, when the council appropriated the money to fund the second tentative agreement (with reduced salary increases) there was no enforceable contract; hence it cannot be said that the HMO contribution rates were "determined by a collective bargaining agreement" as of January 4, 1990.

The argument ignores that the parties from the start expressed their intention, which they never abandoned, to leave intact the health insurance provisions of the 1986-1989 bargaining agreement. The fact that the second tentative agreement was not executed and funded until after January 4, 1990, should not be held controlling where the parties agreed to date and apply the contract with retroactive force from September 1, 1989. (No one disputes that BTU members received salary increases retroactive to that date.) In *Labor Relations Commn.* v. *Selectmen of Dracut*, 374 Mass. 619, 629 (1978), the court left "unresolved" whether a collective bargaining agreement, dated January 1, 1972, to December 31, 1974, and funded on January 27, 1973, "was implemented from January 27, 1973, forward or whether it was effective retroactively to sometime in 1972." There retroactive salary increases were at stake. Subsequent cases reveal a practice of agreeing to the retroactive effectiveness of bargaining agreements. See, e.g., *Somerville* v. *Somerville Mun. Employees Assn.*, 418 Mass. 21, 22 (1994); *Gloucester Fire Fighters, Local 762*, v. *Gloucester*, 8 Mass. App. Ct. 106, 107 (1979). Cf. *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Authy.*, 414 Mass. 323, 328 (1993) (parties, operating under "rollover" provisions in a contract which was being renegotiated, assumed that a collective bargaining agreement could be made retroactively applicable).

Professor Cox reminds us: "The governmental nature of a collective bargaining agreement should have predominant influence in its interpretation. The generalities, the deliberate ambiguities, the gaps, the unforeseen contingencies, the need for a rule although the agreement is silent — all require a

creativeness quite unlike the attitude of one construing a deed or a promissory note or a three-hundred page corporate trust indenture." Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1, 25 (1958). There is need to take account both of the practical necessity to avoid uncontracted-for gaps of time between bargaining agreements and of the often uncomfortable and sometimes unpredictable passage of time while steps of ratification are taken: hence parties assure continuity by contractual provision for retroactivity. The city would have the 1986-1989 contract "expire" on August 31, 1989, and the new contract take on life only when funded in March, 1990. But life continued between these dates: teachers were working and received their salaries and insurance coverage as governed by the old contract; the only open question was the rates of increase in salaries (and incidentals). Bargaining on that question continued[12] and the solution, when reached, was made retroactive to the commencement date of the new contract coinciding with the rest of the agreement. On this view the insurance contribution provisions, as carried over continuously from the earlier bargaining agreement, were grandfathered by § 218. A contrary result appears inequitable in a situation where any BTU member reading the collective bargaining agreement dated 1989-1992 would believe the HMO cost provision continued unchanged and may have made personal decisions accordingly.

4. *Statute based arguments.* The city points to G. L. c. 150E, § 7(*b*): where the city council as "the appropriate legislative body" rejects the request "for an appropriation necessary to fund the cost items, such cost items shall be returned to the parties for further bargaining." G. L. c. 150E, § 7(*b*), as appearing in St. 1977, c. 278, § 4. Of course, a cost item, although agreed to in a collective bargaining agreement, will be of no force if in the end it remains unfunded because a relevant appropriation has not been secured. See *Alliance, AFSCME/SEIU* v. *Secretary*

---

[12]Like salaries, health insurance benefits are a "mandatory" subject of bargaining, see c. 150E, § 6. Absent an "impasse" in negotiations, see § 9 (as appearing in St. 1977, c. 347, § 1), the city "ha[d] a duty to bargain in good faith regarding a change in a mandatory subject prior to implementing that change." *School Comm. of Natick* v. *Labor Relations Commn.*, 388 Mass. 557, 572 (1983), and cases cited. The record reveals that by January 4, 1990, the city had met its "good faith" requirement by agreeing to continue the health insurance provisions from the 1986-1989 contract. At no time following January 4, 1990, did the parties bargain over health insurance.

*of Admn.*, 413 Mass. 377, 384 (1992); *Billerica* v. *International Assn. of Firefighters, Local 1495*, 415 Mass. 692, 696 (1993); *County of Suffolk* v. *Labor Relations Commn.*, 15 Mass. App. Ct. 127, 132-133 (1983). From this premise the city seeks to argue that when the city council declined to fund the salary and other increases and remitted the situation to further bargaining, there was no agreement of any sort that could qualify for § 218 purposes — this despite the existence of the first (June, 1989) "tentative agreement." Otherwise stated, the city's contention is that all the cost items of a collective bargaining agreement must have been fully funded before any of them may be considered effective.

The city's argument is not persuasive when attention is paid to the facts of this case: the city presents only a hollow theory in opposition to the realities, as they appeared to the parties at the time. The "cost items" submitted to the city council for "supplemental appropriation" and rejected by the council in November, 1989, were increases in salary and other benefits that were entirely unrelated to expenditures for insurance premiums — hence the return of "such" cost items to the bargaining table, as provided in G. L. c. 150E, § 7(*b*).[13] The city insists that, with the return to the bargaining table, the insurance contribution rates (as well as the salary increases) became open to renegotiation. If true at all as a technical matter, the city's observation again belies the realities. The insurance contribution rates were not the "cost items" rejected by the city council and in fact these rates were not renegotiated in January, 1990; any attempt to do so would have upset the whole applecart of the prior understandings. By the second "tentative agreement," the parties agreed that the first "tentative agreement" would remain as ratified (in June, 1989) except as "modified." The only financial "modification" was the reduction in the size of teachers' salary increases.

5. *Conclusion.* Where the parties had agreed to continue the contribution rates from the 1986-1989 contract, the relevant

---

[13]One of the stipulated facts states that the $13,600,000 supplemental appropriation ultimately approved by the city council was to fund the FY 1990 costs of the second tentative agreement (January 1990). This second tentative agreement contains only increases in salaries and incidentals. Presumably the funds previously provided, to which the $13,600,000 was supplemental, covered the city's contribution to the HMO premium costs as estimated without the reduction for employees' contributions called for by the new legislation.

money for that contribution was bespoken (see note 12), and the parties to all appearances regarded the issues as settled, there is no difficulty in holding that the particular HMO rate for 1989-1992 was "determined by a collective bargaining agreement" before January 4, 1990.[14] The judge below in finding the rate "determined" before January 4, 1990, rested quite simply on the fact that the parties had expressly agreed before that date to continue the rate from the 1986-1989 contract. And the parties never swerved from that purpose; in fact, they expressly wrote it into the collective bargaining agreement dated, and funded from, September 1, 1989.

The judgment appealed from, allowing the plaintiff's motion for summary judgment and declaring rights in the plaintiff's favor, is affirmed.

*So ordered.*

---

[14]We do not agree with the city's argument that affirming the judgment of the Superior Court will frustrate the purpose of the 1989 amendment. As mentioned above, the facts are singular. Nor is there any suggestion that the parties improperly were attempting to circumvent the amendment. See *Cambridge* v. *Attorney Gen.*, 410 Mass. 165, 173 (1991) ("Municipal employers and employees may not negotiate to avoid complying with laws of general applicability, including insurance regulations"). Moreover, the city could lawfully collect 10% of HMO premium costs (or a larger negotiated contribution rate) from BTU members commencing on September 1, 1992.